<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JHESSYCA O., | Civil Action No. 23-23123 (SDW) |
|              Plaintiff, | **OPINION** |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | January 28, 2025 |
|              Defendant. | |

**WIGENTON**, District Judge.

Before this Court is Plaintiff Jhessyca O.'s ("Plaintiff")[1] appeal of the final administrative decision of the Commissioner of Social Security ("Commissioner") with respect to Administrative Law Judge Ricardy Damille's ("ALJ Damille") denial of Plaintiff's claim for supplemental security income ("SSI") under the Social Security Act (the "Act"). (D.E. 1.) This Court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Venue is proper under 42 U.S.C. § 405(g). This appeal is decided without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

### I.    PROCEDURAL AND FACTUAL HISTORY

#### A.    Procedural History

On June 26, 2020, Plaintiff applied for SSI, alleging disability beginning on January 1,

---

[1] Plaintiff is identified only by her first name and last initial in this opinion, pursuant to Standing Order 2021-10, issued on October 1, 2021, available at https://www.njd.uscourts.gov/sites/njd/ files/SO21-10.pdf.

1

2020.  (D.E. 5 (Administrative Record ("R.")) at 64.)  The Commissioner initially denied Plaintiff's claim on March 16, 2021, and upon reconsideration on February 22, 2022.  (R. 64, 73.)  On August 9, 2022, ALJ Damille held a telephonic administrative hearing and on November 7, 2022, he issued a written decision finding that Plaintiff was not disabled.  (R. 17–27.)  On October 27, 2023, the Appeals Council denied review (R. 1–3), making the ALJ's decision the Commissioner's final decision.  *See* 20 C.F.R. § 406.1481; 42 U.S.C. § 405(g).  Plaintiff then filed the instant appeal in this Court, and the parties timely completed briefing.  (D.E. 1, 6, 10, 11.)

      **B.**      **Factual History**[2]

Plaintiff was born on February 7, 1989 and alleges she became disabled on January 1, 2020 (the "alleged onset date") at thirty-one years old.  (R. 38, 151.)  Plaintiff has a limited education and previously worked as a cashier at McDonald's, a waitress, and most recently, a telemarketer.  (R. 37, 207, 230.)

      1.    Medical Record

The earliest documentation of Plaintiff's mental impairments in the record is from 2019.  (*See* R. 284–90.)  In February 2019 Plaintiff reported she felt "a little depression," but denied suicidal or homicidal ideation.  (R. 1615.)  Progress notes from February 19, March 27, and May 2, 2019 indicate Plaintiff's past medical history included mood disorder and borderline personality disorder ("BPD").  (R. 284, 286, 288.)  During her May 2, 2019 visit at Zufall Health Center, Plaintiff was re-prescribed psychiatric medications to help with the BPD after prematurely giving birth and losing a pregnancy.[3]  (R. 284–85, 948.)

On July 11, 2019, Plaintiff, then approximately two months pregnant, visited the Newton Medical Center ("NMC").  (R. 947.)  She was diagnosed with post-traumatic stress disorder

---

[2] This opinion discusses only the portions of the factual record relevant to Plaintiff's appeal.
[3] Plaintiff stopped taking psychiatric medications during her pregnancy.  (R. 284.)

("PTSD"), related to the loss of her prior pregnancy, and bipolar affective disorder. (R. 947–48.) During a later follow-up appointment at NMC, Plaintiff expressed she still felt depressed and was given samples of Latuda.[4] (R. 913.) In November 2019, Plaintiff inquired about being prescribed methadone[5] and by early December 2019, she indicated feeling "much better" as a result of the methadone treatment. (R. 890–91.) The methadone dosages were increased in January 2020. (R. 873.) On February 8, 2020, Plaintiff gave birth. (R. 850.)

On December 28, 2020, Doctor Marc Friedman, Ph.D., conducted a mental status evaluation of Plaintiff. (R. 1553.) Doctor Friedman concluded Plaintiff showed symptoms consistent with diagnoses of BPD, bipolar disorder, PTSD, and a learning disorder. (R. 1555.) Doctor Friedman reported Plaintiff's social interaction skills were somewhat limited and that her working memory "appeared to be severely impaired," but that she could comprehend and follow multi-step directions. (R. 1555–56.)

Approximately six months later, on June 1, 2021, Doctor Steven Sarner, M.D., completed a mental residual functional capacity questionnaire. (R. 2379–85.) Doctor Sarner, who has treated Plaintiff since she was nineteen years old, indicated Plaintiff suffered from "extreme" depression, anxiety, lack of energy, a low IQ or reduced intellectual functioning, and that her moods fluctuate. (R. 2381, 2384.) He noted that at work, Plaintiff "starts off ok" but then her paranoia increases. (R. 2383.) According to Doctor Sarner, Plaintiff never held a job for more than seven months and her impairments would cause her to be absent about three days per month. (R. 2383, 2385.) However, he also indicated Plaintiff's prognosis

---

[4] Latuda (lurasidone) is an antipsychotic medication that can treat mental health conditions like schizophrenia or bipolar disorder. Cleveland Clinic, *Lurasidone Tablets*, https://my.clevelandclinic.org/health/drugs/19890-lurasidone-tablets (last visited Jan. 26, 2025).

[5] Methadone is a medication used to treat opioid use disorder and to manage pain. Substance Abuse & Mental Health Svcs. Admin., *Substance Use Disorder Treatment Options*, https://www.samhsa.gov/substance-use/treatment/options/methadone (last updated Apr. 11, 2024).

was "good" and that Plaintiff could manage benefits in her own best interest. (R. 2385.)

On September 14, 2021, Doctor Felix Geller, M.D., diagnosed Plaintiff with adjustment disorder with depressed mood; opioid use disorder; opioid withdrawal; post-traumatic stress disorder (past history); and bipolar 1 disorder. (R. 2390.) Thereafter the record contains weekly psychotherapy progress notes from September 2021 to August 2022. (*See generally* R. 2393–2530.)

Doctor Jane Esposito, Psy.D., conducted a psychiatric evaluation of Plaintiff on February 4, 2022. (R. 2332–34.) Doctor Esposito's recorded impressions were: PTSD; major depressive disorder, recurrent and mild to moderate; generalized anxiety disorder; and opioid dependence, in full remission. (R. 2334.) Doctor Esposito noted Plaintiff had "some difficulty with her thought processes," but that her short-term and long-term memory, as well as her insight, judgment, and impulse control, appeared to be "fair." (*Id.*)

Lastly, the record contains a Function Report from Plaintiff, dated July 14, 2020, and a Third-Party Function Report from Plaintiff's mother, Catherine Owens, dated July 17, 2020. (R. 213–29.) Plaintiff describes struggling with behavioral problems since she was a child. (R. 220.) She indicated she had "severe racing thoughts" and difficulty focusing, such that she has never held a job longer than seven months. (R. 213.) She described feeling "out of whack" until taking her medicine on a daily basis. (R. 214.) In her Third-Party Report, Plaintiff's mother indicated Plaintiff had "severe ups and downs," a short attention span, a difficult time following directives when emotional, and that her moods affected her time management. (R. 221.) She reported Plaintiff cooks and cleans and that these activities are helpful when Plaintiff has "racing thoughts/anxiety." (R. 223.) Plaintiff's mother noted Plaintiff does not handle stress well and that change gives her anxiety. (R. 227.) Plaintiff's mother disclosed Plaintiff has struggled with her

mental health since she was eight years old. (R. 229.)

    2. <u>Administrative Hearing</u>

Plaintiff was represented by counsel at the administrative hearing held on August 9, 2022. (R. 32, 34.) ALJ Damille heard testimony from Plaintiff and an impartial vocational expert Joseph Young. (*See generally* R. 32–60.)

Plaintiff testified as to how her background and the alleged mental impairments affect her daily living, as well as what she believed stops her from being able to work. Throughout her testimony Plaintiff either alluded to or directly described abusive or traumatic experiences she went through as early as her childhood. For example, she mentioned witnessing her mother be in a "really bad domestic relationship," undergoing therapy as a child, and being sexually abused when she was twelve years old. (R. 43, 52.) She explained she had been seeing Doctor Sarner since she was eighteen years old. (R. 45–46.) At the time of the hearing Doctor Sarner was treating Plaintiff for her PTSD, anxiety, and depression. (R. 45.) She also explained she received individual therapy, saw a psychiatrist, and had a "medical marijuana doctor." (*Id.*)

Plaintiff described how her depression "affects everything," with every day being like "Russian Roulette" when she wakes up. (R. 44, 49.) She explained she had been taking methadone for almost three years and that she "pretty much rel[ied] on it to feel normal." (R. 49–50.) However, she expressed she still has flashbacks and panic attacks—including when at work—but could not identify any specific triggers. (R. 51–52.) She also stated she takes Gabapentin for her anxiety and depression and used to take Lexapro and Trileptal—which helped with her moods—until she became pregnant. (R. 46–47.)

Plaintiff stated she has "a really hard time" concentrating, focusing, and staying on task when ALJ Damille asked her what stopped her from being able to work. (R. 39.) Plaintiff admitted

5

to walking out on the job three to four times while employed at McDonald's due to her "very aggressive" boss. (R. 43.)  She also admitted she was "late a lot" because she "had a hard time with time management." (R. 44.)  Plaintiff described experiencing "at least three" panic attacks per week while on the job and explained when she had a panic attack or flashback, she would ask her boss to take a small break. (R. 42, 51–52.)

VE Young opined that an individual the same age and with the same education and work experience as Plaintiff could not perform Plaintiff's past work with no exertional restrictions. (R. 55.)  However, he opined such an individual could handle work involving few workplace changes and occasional decision-making and interaction with supervisors, co-workers, and the public. (*Id.*)  According to VE Young, this person would be capable of performing the jobs of cleaner I, industrial; merchandise marker; and routing clerk. (R. 55–56.)

## II.   LEGAL STANDARD

### A. Standard of Review

When reviewing applications for Social Security disability benefits, this Court exercises plenary review of legal issues decided by the ALJ and upholds factual findings if supported by substantial evidence. *Zaborowski v. Comm'r of Soc. Sec.*, 115 F.4th 637, 639 (3d Cir. 2024); 42 U.S.C. § 1383(c)(3); 42 U.S.C. § 405 (g) ("The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive.").  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consolidated Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Under the substantial evidence standard, the threshold for evidentiary sufficiency is not high.  *Id.*  An ALJ's decision cannot be set aside merely because this Court "acting *de novo* might have reached a different conclusion." *Hunter Douglas, Inc. v. N.L.R.B.*,

804 F.2d 808, 812 (3d Cir. 1986). So long as the ALJ's decision sufficiently develops the record and explains its findings to permit meaningful review, the ALJ need not "use particular language or adhere to a particular format" when conducting the analysis. *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).

### B. The Five-Step Disability Test

To make a disability determination, the ALJ follows a five-step, sequential analysis. 20 C.F.R. § 404.1520(a); *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 201–03 (3d Cir. 2019). The ALJ determines whether the claimant: first, is currently engaged in substantial gainful activity ("SGA"); second, has a "severe" and "medically determinable" impairment; and third, has an impairment, or combination thereof, that is equal to or exceeds one of those included in the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Appendix"). 20 C.F.R. §§ 416.920(a)(4)(i)–(iii). Prior to reaching the fourth step, the ALJ considers the claimant's residual functional capacity ("RFC"), which is "the most [the claimant] can still do despite [his or her] limitations," as it relates to meeting "the physical, mental, sensory, and other requirements of work. *Id.* §§ (a)(4)(iv), 416.945(a)(4). Then, at step four, the ALJ determines whether the claimant can still do his or her past relevant work[6] by comparing his or her RFC to the "physical and mental demands" of that work. *Id.* §§ (a)(4)(iv), (f). Lastly, at step five the ALJ decides whether the claimant "can make an adjustment to other work" considering his or her RFC, age, education, and work experience. *Id.* § (a)(4)(v). The claimant bears the burden of proof at all steps except step five, where the burden is on the Commissioner. *Hess*, 931 F.3d at 201.

### III. DISCUSSION

### A. The ALJ's Decision

---

[6] Past relevant work is work performed by the claimant "within the past five years that was substantial gainful activity and that lasted long enough" for the claimant to learn to do it. 20 C.F.R. § 416.960(b)(1)(i).

7

On November 7, 2022, ALJ Damille issued a decision concluding Plaintiff was not disabled under section 1614(a)(3)(A) of the Act.[7] (R. 27.) At step one, ALJ Damille found Plaintiff had not engaged in SGA since June 26, 2020. (R. 19.) At step two, the ALJ concluded the following impairments were severe and significantly limited Plaintiff's ability to perform basic work activities: carpal tunnel syndrome, a depressive disorder, an adjustment disorder, an anxiety disorder, panic disorder, post-traumatic stress disorder, borderline personality disorder, and history of drug abuse. (R. 20.) ALJ Damille determined the evidence did not establish severe impairments involving dyslexia, asthma, and hepatitis C. (*Id.*)

At step three, ALJ Damille concluded Plaintiff's impairments, individually or in combination, did not meet or medically equal the severity of those listed in the Appendix. (*Id.*) Plaintiff's bilateral carpal tunnel syndrome, the ALJ explained, did not meet the criteria of the neurological listings under section eleven of the Appendix. (*Id.*) Similarly, the ALJ found that Plaintiff's moderate limitations[8] related to her mental impairments did not equal the criteria of listings 12.04, 12.06, 12.08, 12.11, and 12.15. (*Id.*) He found that neither the paragraph B or C criteria of the mental impairments listings were met. (R. 21.)

As to Plaintiff's RFC, ALJ Damille concluded Plaintiff can "perform a full range of work at all exertional levels," save some non-exertional limitations. (R. 22.) First, he considered whether the evidence in the record demonstrated a medically determinable mental impairment that could reasonably be expected to produce Plaintiff's symptoms. (R. 23.) ALJ Damille noted Plaintiff had a "history of substance abuse" and "treated with methadone maintenance," relying on

---

[7] Section 1614(a)(3)(A) provides in relevant part: "[A]n individual shall be considered to be disabled for purposes of this subchapter if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

[8] After reviewing the record ALJ Damille found Plaintiff had moderate limitations in: understanding and applying information; interacting with others; concentrating, persisting or maintaining pace; and adapting or maintaining pace. (R. 21.)

8

Doctors Friedman and Geller's notes in which the doctors took record of Plaintiff's past struggles with heroin and her sustained remission since 2019 with the use of methadone. (*Id.*)

After taking into account the doctors' diagnoses and accompanying notes, ALJ Damille found that although there was evidence of mental impairments, there was no evidence of Plaintiff needing "any recurrent emergency room visits, inpatient hospital admissions, crisis intervention or participation in a partial hospitalization program due to an exacerbation of her symptoms." (R. 25.) Plaintiff's treatment records from September 2021 to August 2022 indicated unremarkable mental status examinations. (*Id.*) Further, based on Plaintiff's own testimony, the ALJ pointed out Plaintiff could "perform a number of fully functional activities of daily living, despite her mental impairments." (*Id.*) Second, based on the evidence the ALJ found Plaintiff could not perform a full range of work due to her impairments. (*Id.*) However, he determined she could perform "the simple tasks of unskilled work in a low contact environment," such as tasks that "involve no more than frequent handling, fingering and feeling with the dominant right upper extremity." (*Id.*)

ALJ Damille explained how he considered the medical opinions and prior administrative medical findings in coming to his RFC determination. (R. 25.) He found the prior administrative findings "persuasive overall," as they were "generally consistent with the medical evidence," including most of the doctors' examinations and Plaintiff's reported daily activities. (*Id.*) The ALJ noted both Doctors Friedman and Esposito did not provide a medical opinion regarding Plaintiff's ability to perform work-related activity. (*Id.*) He found Doctor Sarner's mental RFC questionnaire opinion unpersuasive, as it was unsupported by the evidence of benign mental examinations and symptom response with treatment from the Center for Assessment and

Treatment. (*Id.*) Lastly, ALJ Damille considered Plaintiff's mother's Third-Party Statement. (R. 26.)

At step four, ALJ Damille concluded Plaintiff is unable to perform past relevant work as a telemarketer "as actually or generally performed," based on the VE's testimony. (*Id.*) Considering Plaintiff's RFC, age, education, and work experience, ALJ Damille concluded at step five that Plaintiff could perform jobs existing in significant numbers in the national economy. (*Id.*) More specifically, he found she could work as a cleaner, merchandise marker, or as a routing clerk. (R. 26–27.) Thus, the ALJ concluded Plaintiff was not disabled under the Act during the relevant period. (R. 27.)

**B. Analysis**

On appeal, Plaintiff seeks reversal or remand of the Commissioner's decision. (D.E. 6 ("Mov. Br.") at 26.) Plaintiff contends ALJ Damille committed legal error in his analysis of Doctor Sarner's medical opinion by failing to evaluate the opinion for persuasiveness, apply the supportability and consistency factors, and explain why he rejected the opinion. (*Id.* at 19–20.) As to supportability, Plaintiff argues Dr. Sarner "described his clinical findings including results of mental status examination that he relied on to determine the severity of [Plaintiff's] mental impairments." (*Id.* at 21.) Regarding consistency, Plaintiff submits Doctor Sarner's opinion is consistent with Doctor Friedman and Doctor Esposito's findings, Plaintiff's testimony and Function Report, and Plaintiff's mother's statement.

ALJ Damille has the exclusive responsibility of making an RFC determination and examines "all of the relevant medical and other evidence" to do so. 20 C.F.R. §§ 416.945(a)(3) & 416.946(c); *Chandler v. Comm'r of Soc. Sec.*, 667 F.2d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability

10

and RFC determinations."). An ALJ can "accept some medical evidence and reject other evidence, provided that he provides an explanation for discrediting the rejected evidence." *Zirnsak v. Colvin*, 777 F.3d 607, 614 (3d Cir. 2014). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981).

When considering medical evidence, a treating physician's opinion "does not bind the ALJ on the issue of functional capacity." *Brown v. Astrue*, 649 F.3d 193, 196 n.2 (3d Cir. 2011). In conducting his analysis, the ALJ must simply "articulate how [he] considered the medical opinions or prior administrative medical findings from [a] medical source together in a single analysis" considering the eight factors set out in 20 C.F.R. § 416.920c(c). *Id.* Of the eight factors, however, supportability[9] (factor one) and consistency[10] (factor two) are the most important and must be addressed; factors three to eight may, but need not, be addressed. *Id.* § 416.920c(b)(2).

ALJ Damille's analysis of Doctor Sarner's medical opinion is satisfactory and does not amount to legal error. ALJ Damille was not required to give greater weight to Doctor Sarner's findings just because he treated Plaintiff since she was a young adult. *See Chandler*, 667 F.2d at 361. ALJ Damille explained that he found Doctor Sarner's opinion unpersuasive as it was unsupported by the other medical evidence in the record—properly addressing both the supportability and consistency factors. *See Barnhart*, 364 F.3d at 505 (explaining that an ALJ does not need "to use particular language or adhere to a particular format in conducting his analysis," but must simply ensure "there is sufficient development of the record and explanation

---

[9] "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative finding(s) will be." 20 C.F.R. § 416.920c(c)(1).
[10] "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

11

of findings to permit meaningful review."). More specifically, ALJ Damille noted that despite a past medical history of PTSD, depressive disorder, adjustment disorder, and BPD, there was no evidence Plaintiff "required any recurrent emergency room visits, inpatient hospital admissions, crisis intervention or participation in a partial hospitalization program due to an exacerbation of her symptoms." (R. 25.) ALJ Damille's analysis comported with the requirements of 20 C.F.R. § 416.920c(b)(2) and even considered other factors consistent with 20 C.F.R. § 416.920c(c)(5).[11]

This Court is satisfied with ALJ Damille's analysis of Plaintiff's claim and will not re-weigh the evidence. *See Chandler*, 667 F.3d at 359 ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations."). After reviewing the record this Court agrees that there is scant evidence demonstrating Plaintiff's mental impairments, either individually or in combination, equal the severity of the Appendix's listed impairments. This Court finds there is substantial evidence supporting ALJ Damille's conclusion regarding Plaintiff's RFC. ALJ Damille properly concluded Plaintiff is not disabled because she can perform jobs existing in the national economy notwithstanding her non-exertional limitations. (R. 22, 26.)

### IV.   CONCLUSION

For the reasons set forth above, the Commissioner's decision is **AFFIRMED**. An appropriate order follows.

/s/ Susan D. Wigenton  
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:   Clerk  
cc:     Parties

---

[11] 20 C.F.R. § 416.920c(c)(5) provides in relevant part: "We will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding . . . When we consider a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive."